UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) ) | |
| v. | ) ) | CRIMINAL ACTION NO. 22-40017-MRG |
| JONATHAN GONZALEZ et al, | ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OF DECISION AND ORDER,
ON DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE**
January 27, 2025

**GUZMAN, D.J.**

On September 8, 2022, a grand jury returned an indictment charging Jonathan Gonzalez, Ismael Maysonet, Juan Torres, Issac Gonzalez, Nataly Pizarro, Nelson Tejeda Gomez, William Torres and Deborah Torres and others ("Defendants") with conspiracy to distribute and possess with intent to distribute 400 grams or more of fentanyl and five kilograms more of cocaine and distribution and possession with intent to distribute 100 grams or more of p-Fluorofentanyl, 40 grams or more of fentanyl, and 28 grams or more of cocaine base.

Before the Court are three motions to suppress evidence obtained from several wiretaps authorized by this Court under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 ("Title III"). The validity of the wiretap is being challenged by Jonathan Gonzalez (Docket No. 555), the lead defendant in this drug conspiracy case, who is joined by Isaac Gonzalez, Nelson Tejeda Gomez and William Torres (Docket Nos. 677, 681, and 682). Also challenging the validity of the wiretaps is Juan Torres, Jr. (Docket No. 663), who is joined by Isaac

1

Gonzalez, Gomez, William Torres and Deborah Torres (Docket Nos. 677, 682, and 664). Ismael Maysonet filed a separate motion to suppress (Docket No. 518). The Court will consider each motion and for the reasons set forth below, all motions to suppress are **denied**.

I.      **Factual Background**

The Gonzalez drug trafficking organization ("DTO") distributed cocaine, fentanyl, and other narcotics to retail customers and to other drug dealers. The investigation of the Gonzalez DTO was conducted by DEA agents and Task Forces Officers, United States Postal Inspection Services ("USPIS") inspectors and officers from state and local law enforcement agencies. The investigation was initiated after a cooperating informant ("CI-2"), who was known by the Southbridge Police Department (SPD), informed the SPD that a package containing illegal narcotics was being sent through the USPS to 3 Stevens Street in Southbridge, Massachusetts.

Since that time, investigators obtained information about the Gonzalez DTO through physical surveillance, electronic location monitoring pursuant to search warrants, phone toll records, tracking of USPS packages and other investigative techniques. Members of the Gonzalez DTO had been observed by investigators receiving and transporting packages believed to contain cocaine at various addresses in Southbridge. Investigators also intercepted two packages, similarly addressed and originating in Puerto Rico, which contained cocaine.

April Interception

On April 11, 2022, the Honorable Leo T. Sorokin authorized the interception of the defendant Jonathan Gonzalez's telephone (hereinafter, "Target Telephone 1") for a period of 30 days (hereinafter, the "April Order," filed separately as Exhibit B). The April Order applied to Target Telephone 1 ("TT1"), phone number (774) 241-6645, identified as being used by Mr. Gonzalez, and Target Telephone 2 ("TT2"), phone number (774) 417-3507, identified as used by

Isaac Gonzalez. The authorization was based on the Affidavit of Drug Enforcement Administration ("DEA") Special Agent Patrick L. Kelly (hereinafter, the "April Affidavit," filed separately as Exhibit A).

The April Affidavit established the following goals for the investigation:

Establishing the full scope and nature of the criminal activities of the Target Subjects and their criminal associates;

1. Identifying the individuals who supply the Gonzalez DTO with cocaine and other drugs, including the manner in which the Gonzalez DTO obtains controlled substances;

2. Identifying and obtaining admissible evidence concerning the individuals who distribute the cocaine and other drugs obtained by the Gonzalez DTO and those who assist the Target Subjects in distributing controlled substances;

3. Identifying and obtaining sufficient evidence to prosecute the individuals who assist Gonzalez, Isaac [Gonzalez] and the Gonzalez DTO in collecting and laundering drug proceeds;

4. Identifying the locations used in furtherance of the Target Offenses, and in particular where the controlled substances are stored in Massachusetts and elsewhere, and the locations where the controlled substances are distributed;

5. Determining the location and source of resources used to finance the Target Offenses and the locations and disposition of proceeds from the Target Offenses; and,

6. Determining the times, dates, and methods used when drugs and the proceeds of drug distribution are delivered, picked up, and distributed.

April Affidavit ¶ 122. I

The April Affidavit indicated Jonathan Gonzalez as the listed subscriber and user of Target Postal Service ("USPS") packages containing cocaine. These packages were shipped from Puerto Rico and sent to Southbridge, Massachusetts, the base of operations of the Gonzalez Drug

Trafficking Organization ("DTO"). The April Affidavit also contained the names of 11 other Target Subjects who investigators believed actively participated in the drug-trafficking operations of the Gonzalez DTO.

In the April Order, Judge Sorokin found probable cause to believe that several individuals, including Jonathan Gonzalez, were engaged in the commission of numerous criminal offenses enumerated in 18 U.S.C. § 2516, including: possession and distribution of controlled substances; use of a communication facility to commit a drug offense; and conspiracy to commit drug trafficking offenses, among others (hereinafter, the "Target Offenses"). Judge Sorokin further found that the April Affidavit established probable cause to believe that Target Telephone 1 was being used in furtherance of the Target Offenses, and that the interception of wire and electronic communications over Target Telephone 1 would reveal admissible evidence regarding, inter alia, the commission of the Target Offenses, the identity of the persons involved in the commission of the Target Offenses, and the scope and nature of the illegal activity. Judge Sorokin also found that the April Affidavit established that normal investigative procedures have been tried and have failed, reasonably appear unlikely to succeed if continued, reasonably appear unlikely to succeed if tried, or are too dangerous to pursue in developing the evidence necessary for prosecution of the Target Offenses, in other words, necessity. Pursuant to the April Order, investigators began intercepting Target Telephone 1 on April 12, 2022 and terminated this initial period of interception on May 11, 2022.

Judge Sorokin further found that the April interception of wire and electronic communications over Target Telephone 1 would reveal admissible evidence regarding, inter alia, Telephone 1, actively used that phone to coordinate for the commission of the Target Offenses, the identity of the persons involved in the commission of the Target Offenses, and the scope and

nature of the illegal activity. Judge Sorokin also found that the April Affidavit established that normal investigative procedures have been tried and have failed, reasonably appear unlikely to succeed if continued, reasonably appear unlikely to succeed if tried, or are too dangerous to pursue in developing the evidence necessary for prosecution of the Target Offenses, in other words, necessity. Pursuant to the April Order, investigators began intercepting Target Telephone 1 on April 12, 2022 and terminated this initial period of interception on May 11, 2022.

<u>May Interception</u>

On May 11, 2022, the Honorable Timothy S. Hillman authorized the continued interception of Target Telephone 1 for an additional period of 30 days (hereinafter, the "May Order," filed separately as Exhibit D). The authorization was based on a second Affidavit of DEA Special Agent Kelly (hereinafter, the "May Affidavit," filed separately as Exhibit C). The May Affidavit contained additional Target Subjects who investigators had identified over the course of the first Case 4:22-cr-40017-MRG Document 578 Filed 12/05/23 Page 3 of 22 4 30-day interception period. It also included intercepted calls involving Jonathan Gonzalez, in which he discussed the sale of four kilograms of narcotics with an unknown male and subsequently aborted the deal due to his identification of investigators conducting surveillance of the arranged drug deal.

In the May Order, Judge Hillman also found probable cause to believe that the Target Subjects – including Gonzalez, Maysonet and Torres – were engaged in the commission of the Target Offenses; that Target Telephone 1 was being used in furtherance of the Target Offenses, Affidavit established probable cause to believe that Target Telephone 1 was being used in furtherance of the Target Offenses, and that the interception of wire and electronic communications over Target Telephone 1 would reveal admissible evidence regarding the commission of the Target Offenses and identity of the persons involved in these crimes; and that

normal investigative procedures were insufficient to meet the goals of the investigation – necessity. Pursuant to the May Order, investigators continued intercepting Target Telephone 1 from May 12, 2022, and terminated this second period of interception on June 9, 2022. At the completion of this interception period, the government did not seek an additional order to continue interceptions for Target Telephone 1.

Cellphone Location Warrants

On April 14, 2022, and again on May 11, 2022, Magistrate Judge David H. Hennessy found probable cause to issue warrants for location data for a cellphone used by Maysonet. See 21-4121-DHH & 21-4192-DHH.2

June Interception

On June 9, 2022, the Honorable Timothy S. Hillman authorized the continued interception of Target Telephones 2 and 3 for an additional period of 30 days (the "June Warrant"). Authorization was based on a third Affidavit of DEA Special Agent Kelly (the "June Affidavit").

As with the two previous orders, Judge Hillman found probable cause to believe that the Target Subjects were engaged in the commission of the Target Offenses; that Target Telephones 2 and 3 were being used in furtherance of the Target Offenses; and that the interception of wire and electronic communications over Target Telephones 2 and 3 would reveal admissible evidence regarding the commission of the Target Offenses and identity of the persons involved in these crimes. Judge Hillman found normal investigative procedures were insufficient to meet the goals of the investigation and continued electronic intercepts were necessary. Pursuant to the June Order, investigators continued intercepting Target Telephones 2 and 3 for an additional 30 days. This was the last period of interception.

Procedural Background

On September 8, 2022, a Boston federal grand jury returned an indictment charging Jonathan Gonzalez, Maysonet, Torres and 19 others with conspiracy distribute and possess with intent to distribute 400 grams or more of fentanyl and five kilograms or more of cocaine and distribution and possession with intent to distribute 100 grams or more of p-Fluorofentanyl, 40 grams or more of fentanyl, and 28 grams or more of cocaine base.

On September 20, 2023, Maysonet filed his motion to suppress the evidence obtained from the April Warrant and the ping location evidence obtained pursuant to the April Ping Warrant and the May Ping Warrant. On October 25, 2023, Gonzalez filed his motion to suppress the evidence obtained from the initial and continued wiretap of TT1 and TT2. Defendants Isaac Gonzalez, Nelson Tejeda Gomez, Deborah Torres and William Torres join Gonzalez in his motion to suppress. Torres filed his motion to suppress on February 23, 2024, requesting the Court to suppress all evidence obtained through all of the wiretaps as to TT2 and TT3. Torres is joined on his motion by Isaac Gonzalez, Nelson Tejeda Gomez, Deborah Torres and William Torres.

## II.  Standard of Review

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510, promulgates the standards and procedures for the use of electronic surveillance. A judge may allow an application for interception of wire communications only when the following conditions are met:

> (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;
>
> (b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

7

> (c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried to be too dangerous; and
>
> (d) except as provided in subsection (11), there is probable cause for belief that the facilities from which, or the place where, the wire, oral or electronic communications are to be intercepted are being used, or area about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. § 2518(3).

A reviewing court will uphold a wiretap if the facts in the affidavit are "minimally adequate" to support the determination of the issuing judge that other procedures were unlikely to succeed. United States v. Rose, 802 F.3d 114, 118 (1st Cir. 2015) (quoting United States v. Yeje-Cabrera, 430 F.3d 1, 7 (1st Cir. 2005)).

*Necessity*

Title III requires that the government include in its wiretap application "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). This provision is commonly referred to as the "necessity" requirement, which has been interpreted by the courts to mean that the government must demonstrate that it has "made a reasonable, good faith effort to run the gamut of normal investigative procedures" before resorting to electronic surveillance. See U.S. v. Villarman-Oviedo, 325 F.3rd, 1, 9 (1st Cir. 2003) (quoting United States v. Hoffman, 832 F.2d 1299, 1306-07 (1st Cir. 1987)). In applying this requirement, the First Circuit has emphasized that: the government does not need to exhaust all other investigative procedures before resorting to wiretapping. Nor must ordinary techniques be shown to have been wholly unsuccessful. Rather, the district court must satisfy itself that the government has used normal techniques, but it has encountered difficulties in penetrating a criminal enterprise or in gathering evidence B to the point where (given the statutory preference for less intrusive

8

techniques) wiretapping becomes reasonable. United States v. Abou-Saada, 785 F.2d 1, 11 (1st Cir. 1986) (citations omitted); see also United States v. Martinez, 452 F.3d 1, 4 (1st Cir. 2006) (emphasizing that government need not show that other methods of investigation have been entirely unsuccessful). Said differently: [a]n application for electronic surveillance need not be based on proof positive that, without electronic assistance, a promising investigation is up a blind alley. It is enough that reasonable efforts to succeed without such assistance have been tried and failed, and that electronic surveillance seems a suitable next step in a plausible progression. United States v. David, 940 F.2d 722, 729 (1st Cir. 1991); see also United States v. Gordon, 871 F.3d 35, 45 (1st Cir. 2017) (finding that necessity "is not an absolute. [R]ather it must be viewed through the lens of what is pragmatic and achievable in the real world").

When a defendant challenges a court's determination of necessity, the reviewing court's role is "not to make a de novo determination of sufficiency," United States v. Santana, 342 F.3d 60, 65 (1st Cir. 2003), but, instead, to inquire as to "whether the facts set forth in the application were minimally adequate to support the determination that was made." United States v. Rose, 802 F.3d 114, 118 (1st Cir. 2015) (emphasis added, internal quotations and citations omitted). The sufficiency of the wiretap affidavit will be upheld "wherever the issuing court could have reasonably concluded that normal investigatory procedures reasonably appeared to be unlikely to succeed." United States v. Yeje-Cabrera, 430 F.3d 1, 8 (1st Cir. 2005) (internal citations omitted). Further, this Court "must test the government's recital of antecedent investigatory methods in a practical and commonsense manner." United States v. Ashley, 876 F.2d 1069, 1073 (1st Cir. 1989) (internal citations omitted). Moreover, the "'full and complete statement' requirement does not mandate that officers include every single detail of an investigation, even if relevant to the need for a wiretap." United States v. Cartagena, 593 F.3d 104, 110 (1st Cir. 2010).

9

The "necessity" requirement demands that "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." United States v. Rodrigues, 850 F.3d 1, 9 (1st Cir. 2017) (quotation marks and citations omitted). Accordingly, the wiretap applicant must show that "the government has made a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls." United States v. Martinez, 452 F.3d 1, 4 (1st Cir. 2006) (quotation marks and citations omitted). The First Circuit has ruled however that "the government is not required to show that other investigative methods have been wholly unsuccessful, nor must the government exhaust all other investigative measures before resorting to wiretapping." United States v. Cartagena, 593 F.3d at 109 (citations omitted).

In order to satisfy the necessity requirement, the Government is required to show that it "has used normal techniques but it has encountered difficulties in penetrating a criminal enterprise or in gathering evidence—to the point where (given the statutory preference for less intrusive techniques) wiretapping becomes reasonable." United States v. Abou-Saada, 785 F.2d 1, 11 (1st Cir. 1986). "[B]are conclusory statements that normal techniques would be unproductive, based solely on an affiant's prior experience" are not enough to satisfy the necessity requirement. United States v. Ashley, 876 F.2d 1069, 1072 (1st Cir. 1989).

When a defendant challenges a court's determination of necessity, the reviewing court's role is "not to make a de novo determination of sufficiency," United States v. Santana, 342 F.3d 60, 65 (1st Cir. 2003), but, instead, to inquire as to "whether the facts set forth in the application were minimally adequate to support the determination that was made." United States v. Rose, 802 F.3d 114, 118 (1st Cir. 2015) (emphasis added, internal quotations and citations omitted). The sufficiency of the wiretap affidavit will be upheld "wherever the issuing court could have

reasonably concluded that normal investigatory procedures reasonably appeared to be unlikely to succeed." United States v. Yeje-Cabrera, 430 F.3d 1, 8 (1st Cir. 2005) (internal citations omitted)

*Probable Cause*

Before a wiretap can be authorized, Title III requires that the government show "there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense." 18 U.S.C. § 2518(3)(a). "Probable cause exists when the affidavit demonstrates in some trustworthy fashion the likelihood that an offense has been or is being committed." United States v. Santana, 342 F.3d 60, 65 (1st Cir. 2003) (citing United States v. Vigeant, 176 F.3d 565, 569 (1st Cir. 1999)). A reviewing court must consider the "totality of the circumstances stated in the affidavit" and make a "practical, common-sense determination, according deference to reasonable inferences that the issuing judge may have drawn." United States v. Sylvestre, 78 F.4th 28, 33 (1st Cir. 2023) (quotations and citations omitted), cert. denied, 144 S. Ct. 370 (2023); see also Illinois v. Gates, 462 U.S. 213, 243 n.13 (1983) ("[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.").

### III. Jonathan Gonzalez Motion to Suppress

Jonathan Gonzalez, joined by Issac Gonzalez, Gomez and William Torres, seeks to suppress his communications obtained from the initial and continued wiretap of Target Telephone 1 pursuant to the April and May Warrants. In support, Gonzalez asserts that the affidavit in support of the first wiretap application lacks sufficient facts to support the necessity requirement and that the second wiretap application lacks sufficient facts to establish probable cause to believe that intercepted communications would contain evidence of the Target Offenses.

In connection with the April Order, the government submitted the April Affidavit, detailing the use, consideration and/or rejection of a number of traditional investigative procedures that the

11

agents prior to seeking the wiretap. Those investigative methods included the use of cooperating sources and witnesses, the use of undercover agents, financial investigation, interviews of subjects and their associates, use of pen register, trap and trace devices, toll records, search warrants, examination of discarded trash, physical surveillance, and arrests of subjects. The April Affidavit explicitly explained how each of those investigative techniques had been used to limited success, were unlikely to succeed if used, or were too dangerous.

 The April Affidavit established the following goals for the investigation:

> a. Determining the times, dates, and methods used when drugs and the proceeds of drug distribution are delivered, picked Establishing the full scope and nature of the criminal activities of the Target Subjects and their criminal associates;
>
> b. Identifying the individuals who supply the Gonzalez DTO with cocaine and other drugs, including the manner in which the Gonzalez DTO obtains controlled substances;
>
> c. Identifying and obtaining admissible evidence concerning the individuals who distribute the cocaine and other drugs obtained by the Gonzalez DTO and those who assist the Target Subjects in distributing controlled substances;
>
> d. Identifying and obtaining sufficient evidence to prosecute the individuals who assist Gonzalez, Isaac and the Gonzalez DTO in collecting and laundering drug proceeds;
>
> e. Identifying the locations used in furtherance of the Target Offenses, and in particular where the controlled substances are stored in Massachusetts and elsewhere, and the locations where the controlled substances are distributed;.
>
> f. Determining the location and source of resources used to finance the Target Offenses and the locations and disposition of proceeds from the Target Offenses; and
>
> g. up, and distributed.

April Affidavit ¶ 122.

In the April Affidavit, Agent Patrick Kelly next explained why traditional investigative techniques were insufficient to meet these goals. *Id.* ¶¶ 124 – 163. In his description, Agent Kelly described the thorough investigative work performed in this investigation before applying for a wiretap. Agent Kelly described the government's use of confidential informants and undercover officers in the investigation; collected and ran all addresses and phone numbers through law enforcement databases in an attempt to determine if the DEA or any other law enforcement agencies had any CI's who could provide assistance, all with negative results. In addition, given the family-business orientation of the Gonzalez DTO, Agent Kelly determined that it was not possible to attempt to introduce a cooperating witness or an additional CI to the DTO without compromising the ongoing investigation. For the same reason, Agent Kelly considered and rejected any attempt to introduce an undercover officer to the Gonzalez DTO. This type of thorough consideration of investigative tools and options clearly met the standard of "a reasonable, good faith effort to run the gamut of normal investigative procedures" before resorting to electronic surveillance. See Villarman-Oviedo, 325 F.3d at 9.

In considering the totality of the circumstances, the facts set forth in the affidavits submitted adequately demonstrated that "other investigative procedures . . . reasonably appear to be unlikely to succeed if tried." 18 U.S.C. § 2518(1)(c). Kelly offered credible, fact-specific, and detailed explanations regarding the unlikelihood of approaches that had already been utilized in the course of the investigation – working with cooperating witnesses and confidential informants, attempted placement of undercover agents, physical surveillance, search warrants, and use of pen registers and trap and trace devices – in accomplishing the pending investigatory goals. Kelly described having already "considered and rejected" the use of trash searches and explained the basis for his conclusion that the technique, even in those limited locations in which it was feasible,

would not provide "sufficient information to satisfy the goals of the investigation." Finally, Kelly articulated in clear terms, why various other investigative tools e.g., grand jury subpoenas and interviews of potential witnesses) would either thwart the investigation or were unlikely to bear fruit.

Gonzalez also fails to consider the broad goals of the investigation. While traditional investigative may have been sufficient to prosecute Gonzalez, they would not have been enough to successfully unearth and prosecute co-conspirators. For example, in United States v. Rivera, the defendant similarly argued that traditional investigative methods were yielding results and "there was no reason to believe that they were unlikely to succeed." 267 F. Supp. 3d 275, 276-77 (D. Mass. 2017). The court concluded that the necessity requirement was met because, in addition to other factors, the affidavit stated, "the investigative objects that had not yet been met that justified a wiretap." Id. at 277; see also United States v. David, 940 F.2d 722, 729 (1st Cir. 1991) ("An application for electronic surveillance need not be based on proof positive that, without electronic assistance, a promising investigation is up a blind alley. It is enough that reasonable efforts to succeed without such assistance have been tried and failed."); United States v. Delima, 886 F.3d 64, 70 (1st Cir. 2018) ("We have upheld wiretap applications supported by affidavits that explain why the continued use of traditional investigative techniques (such as confidential sources, grand jury subpoenas, search warrants, surveillance and consensual monitoring) would be ineffective in uncovering the full scope of the potential crimes under investigation.") (internal citations omitted); United States v. Santana, 342 F.3d 60, 66 (1st Cir. 2003) (holding that the government's affidavit stating "that a wiretap was necessary to uncover the full scope of the conspiracy, including conclusive proof of identity and information as to how the drug sales were made" contained the requisite details "regarding its inability to purse the criminal activity through less intrusive

means"). The Court finds that the investigative efforts of the Government complied with the "necessity" requirement and that the Affidavit demonstrates that the Government made a "reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of phone calls." <u>Villarman-Oviedo</u>, 325 F3rd at 9, <u>quoting</u> <u>U.S. v. Hoffman</u> 832 F2nd 1299, 1306-1307 (1st Cir. 1987).

In the May Affidavit, Agent Kelly described numerous facts sufficient to meet the standard of probable cause that Jonathan Gonzalez was engaging in violations of the Target Offenses and evidence of this criminal conduct would be intercepted over Jonathan Gonzalez's phone, Target Telephone 1. Agent Kelly described the defendant's role in facilitating the receipt of multiple packages of suspected cocaine. He provided Jonathan Gonzalez's criminal history. Finally, Agent Kelly described and interpreted multiple wiretap interceptions from four separate days spread across the interception period in which the defendant used Target Telephone 1 to discuss cutting, mixing, and packaging drugs, and arranging a drug sale. The defendant and his coconspirator also discussed the price for multiple kilograms of suspected cocaine.

These facts provided an ample basis for Judge Sorokin and Judge Hillman to find probable cause. In considering the totality of the circumstances, the facts that set forth the affidavit are substantially beyond the "minimally adequate" threshold to establish probable cause to believe that defendant was involved in a DTO, and that further interception would reveal more information about his involvement in that offense. Based on the information contained in the May Affidavit, which incorporated the April Affidavit and those that were issued before it concerning the same DTO, there was ample probable cause to believe that multiple individuals had committed, were committed, and would continue to commit criminal offenses.

Moreover, even assuming the order were invalid, it was not so clearly invalid to overcome the monitoring agents' reasonable, good-faith reliance on them, which alone would counsel against suppression. See United States v. Leon, 468 U.S. 897, 926 (1984).

IV. **Juan Torres Motion to Suppress**

Juan Torres seeks to suppress his communications and argues that the affidavits in support of the April and May Wiretaps were not supported by probable cause and that none of the three Wiretaps satisfied the necessity requirement. Torres also argues that the communications obtained from the June Wiretap should be suppressed because it is fruit of the poisonous tree.

As discussed above and in considering the totality of the circumstances, the facts set forth in the Affidavits are more than the "minimally adequate" threshold level that is required to establish probable cause. In addition, and also discussed above, the Court finds the affidavits for the April and May interceptions describe numerous investigatory techniques in detail and supplies an adequate basis for concluding that the normal investigative techniques had been adequately attempted and were insufficient for these purposes. Accordingly, the motion will not be granted on the basis of necessity.

Even assuming the order was invalid, it was not so clearly invalid to overcome the monitoring agents' reasonable, good-faith reliance on them, which alone would counsel against suppression. See United States v. Leon, 468 U.S. 897, 926 (1984).

V. **Ismael Maysonet Motion to Suppress**

Maysonet seeks to suppress his communications obtained pursuant to Title III wiretaps of the contents of recorded communications obtained pursuant to a wiretap warrant issued on April 11, 2022. He moves, further, to suppress "ping" location evidence seized pursuant to warrants

issued on April 14, 2022, and May 11, 2022. As grounds, Maysonet argues that the information in the supporting affidavit, as it related to him, was stale and did not establish probable cause. Maysonet further argues that warrants for location data for his cellphone should be suppressed, because it relied on the intercepted communications.

In evaluating staleness, the Court "must assess the nature of the information, the nature and characteristics of the suspected criminal activity, and the likely endurance of the information." United States v. Encarnacion, 26 F.4th 490, 497-98 (1st Cir. 2022). As the First Circuit recently explained, large scale drug conspiracies "normally will have a longer shelf life" than other criminal activity. See Encarnacion, 26 F.4th at 497 (citing United States v. Schaefer, 87 F.3d 562, 568 (1st Cir. 1996) (observing that longer-running nature of drug-trafficking conspiracies makes it more likely that "a datum from the seemingly distant past will be relevant to a current investigation")); see also United States v. Nocella, 849 F.2d 33, 40 (1st Cir. 1988) (noting that "drug trafficking, if unchecked, is apt to persist over relatively long periods of time" so that the shelf life of facts supporting probable cause may be longer).

Judge Sorokin was not authorizing a wiretap of Maysonet's phone. Rather, Judge Sorokin found probable cause for a wiretap of the phones of co-defendants Jonathan Gonzalez and Isaac Gonzalez. The facts related to Maysonet were only a piece of the factual recitation that supported Judge Sorokin's probable cause finding as to Jonathan and Isaac Gonzalez's phones. As explained above, probable cause existed to wiretap Jonathan and Isaac Gonzalez's phones even absent any information regarding Maysonet. Because a wiretap for Jonathan and Isaac Gonzalez's phones would have issued even absent facts about Maysonet, there is no basis to exclude the subsequently intercepted communications of Maysonet.

The facts about Maysonet recited in the April 11 Affidavit were recent enough to form part of the basis for Judge Sorokin's probable cause determination. The April 11 Affidavit described an ongoing drug conspiracy in which members of the Gonzalez drug-trafficking organization conspired to receive packages of cocaine in the mail at various addresses in and around Southbridge. Maysonet's involvement included an event less than two months before the April 11 Affidavit, in which Maysonet had phone calls with Jonathan Gonzalez on the expected delivery date of a cocaine package. Even if Maysonet's personal involvement greatly affected Judge Sorokin's probable cause finding as Maysonet claims, that event alone was sufficiently recent to contribute to Judge Sorokin's finding. Even the earlier facts related to Maysonet were sufficiently recent to contribute to Judge Sorokin's probable cause finding. The earliest allegation comes from October 28, 2021. On that occasion, investigators saw Maysonet pick up a suspected cocaine package, addressed to a fictitious person, from 162 Dresser Street in Southbridge.

Because the intercepted communications discussed in the two cellphone-location data warrants, 21-4121-DHH and 21-4192-DHH, were obtained pursuant to a valid Title III wiretap, there is no basis to suppress those warrants on that ground. The Information in the Warrants for Cellphone Location Data Supported Magistrate Judge Hennessy's Probable Cause Determination Magistrate Judge Hennessy found probable cause to issue two warrants for location data for cellphones used by Maysonet. Maysonet argues those warrants did not meet the "nexus" requirement for a warrant because the affidavits only showed the movement of Maysonet's cellphone.

The warrants for location data for Maysonet's cellphone established that Maysonet was engaged in drug trafficking by working with members of the Gonzalez drug-trafficking organization to coordinate the receipt of packages containing drugs. Accordingly, there was

probable cause to believe that knowing Maysonet's location, via his cellphone's location, would provide evidence of the various kinds of drug trafficking that Agent Kelly discussed in his affidavit.

Finally, even assuming the orders were invalid, it was certainly not so clearly invalid to overcome the monitoring agents' reasonable, good-faith reliance on them, which alone would counsel against suppression.  See United States v. Leon, 468 U.S. 897, 926 (1984).

## Conclusion

For the reasons stated, Defendant Jonathan Gonzalez's motion to suppress (Docket No. 555) is **DENIED**, Defendant Maysonet's motion to suppress (Docket No. 518) is **DENIED** and Defendant Torres's motion to suppress (Docket No. 663) is **DENIED**.

**SO ORDERED.**

/s/ *Margaret Guzman*
**MARGARET GUZMAN**
**DISTRICT JUDGE**